# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | Case No. 1:15CV00052 |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **JOE WATSON, ET AL.,** ) | By: James P. Jones |
| ) | United States District Judge |
| Defendants. ) | |

*Caroline D. Ciraolo, Principal Deputy Attorney General, and Nelson Wagner, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, D.C., for United States; Kenneth R. Russell, Jr., and Mary F. Russell, Russell Law Firm, Bristol, Virginia, for Defendant Joe Watson.*

The United States instituted this action against defendants Joe Watson ("Watson") and his wife Betty Watson in order to collect federal payroll tax assessments. Count I of the Complaint seeks to reduce to judgment the tax assessments made against Watson, and Count II seeks to foreclose federal tax liens against real property owned by Watson and his wife. Following discovery, the United States has moved for summary judgment against Watson as to Count I.[1]

---

[1] The Bristol City Health Department was originally an additional defendant to the Complaint, and the City of Bristol, Virginia, was later added as a defendant, on the grounds that these defendants may have had a leasehold interest in the subject real estate. Both defendants have since been dismissed as parties.

The motion has been fully briefed and is ripe for decision.[2] For the following reasons, I find that summary judgment is warranted.

I.

The following undisputed facts are taken from the summary judgment record.

The defendant Joe Watson founded Tri-Cities Industrial Builders, Inc. ("Company") in the early 1970s and was its sole owner from 1978 until the Company ceased doing business in late 2001 or early 2002. The Company was engaged in the commercial and industrial construction business. At the height of its operations, the Company employed more than 200 people.

Watson was the CEO of the Company. He did not report to anyone. The Company did not have a separate board of directors. Watson had the authority to hire and fire employees and to set salaries, though he delegated that authority to others. He had the authority to purchase equipment. Watson worked at the Company full-time and went to the office nearly every day until the Company closed. At some point, Watson's son Joey Watson ("Joey") began to take a more active role in the Company, and Watson hoped eventually to transition control of

---

[2] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

the Company to him. However, Watson remained in charge and was the final decision maker.

Kathy Swindall began working for the Company in the early 1990s. She was the office manager and oversaw the bookkeeping and payroll functions. Watson provided Swindall with a signature stamp of his signature, and she used that to sign checks and pay the Company's bills. Watson had signature authority for the Company's bank accounts, but it was unusual for him to physically sign checks. Watson closely reviewed the Company's finances at the end of each year with the Company's accountants, but he did not review financial reports on a day-to-day basis. He testified in his deposition that he did not receive a weekly or monthly report showing which of the Company's creditors needed to be paid. During his deposition, Watson was asked how he knew what money was flowing out of the Company. He responded, "I hate to admit this, but I didn't. I mean, I just trusted my people to, you know, that they paid bills like they should be paid, they paid the payroll. And I just never was an accounting-type person." (Mot. for Summ. J. Against Joe Watson as to Count I, Ex. A, ECF No. 22-1 at 104.)[3] Watson at least occasionally received printed reports detailing the Company's finances, but he did not go through them. After Swindall left the Company,

---

[3] The government filed exhibits in support of summary judgment, including portions of deposition transcripts, as one ECF document, The page numbers cited refer to the page numbers of that one ECF document, rather than the page numbers of the individual exhibits.

Watson's daughter-in-law, Tammy Watson ("Tammy"), took over her duties. Ensuring that federal taxes were remitted on time was within Swindall's duties and, later, Tammy's duties.

At some point early in Swindall's tenure, she had told Watson that when she had processed the payroll, there had not been enough money to pay the payroll taxes. Swindall testified at her deposition that in the year before she left the Company, she was concerned about the Company's inability to meet its financial obligations, including paying taxes. She testified that she began creating cash flow reports and hand-delivering them to Watson. Watson told her which debts should be paid first to keep the Company operating. While Watson never specifically told Swindall not to pay the Internal Revenue Service ("IRS"), there were times when he told her to pay other creditors first. Swindall testified that she recalled giving Watson notices from the IRS. Swindall began working from home around 1999, and she did not interact with Watson from that time until the end of her employment with the Company in early 2001. While she was working from home, she interacted with Joey. Watson did not see reports of how many hours employees were working at any time after 1998.

Gordon Vance was an accountant that the Company hired to handle the Company's taxes. Vance prepared the Company's tax returns. The Company also

used an outside accounting firm for limited purposes. The outside firm did not have any role in determining which creditors would be paid.

Vance worked as the Company's comptroller from mid-1997 through the end of 2001. In addition, he worked for Bristol Garment, another company co-owned by Watson that had also fallen behind on its payroll tax obligations. Vance worked for Bristol Garment for two to three years in the late 1990s. He testified that Watson's Bristol Garment business partner had been in charge of day-to-day operations and had failed to pay the taxes and then suddenly disappeared. The IRS attempted to collect the tax debt by placing liens against properties owned by Watson. Watson hired Vance to sort out the documentation issues and come up with a way to pay the amounts owed. Bristol Garment had already ceased operations by the time Vance began working to rectify its accounting and tax issues.

Vance recalled the Company falling behind on its tax obligations in 2000 and 2001. He described his conversations with Watson as follows:

> Well, I think the conversations were more of the nature that, you know, you've had this happen with this particular company, and, you know, the IRS has remedies and will take actions quicker than probably a general creditor would in any kind of business. I mean, I, having worked in the public-accounting realm, I knew of the liens and capabilities and stuff like that. But, you know, we didn't say well we've got to put this in place to prevent it from happening, per se.
>
> But in the event that payroll taxes needed to be remitted, I always tried to caution Joe that pay 'em as quickly as you can, don't

let 'em lag. Because the penalty and interest structure of that whole process gets you in deeper much quicker than a general creditor would be, you know, a 5% penalty per month and the interest. I said let's try to make sure we pay 'em as quickly as we can.

And when they didn't get paid, and I do know of instances where they didn't pay a lease payroll return, tried to encourage Joe to get 'em paid as quickly as he could. But I had no ability to actually force that to happen.

(Mot. for Summ. J. Against Joe Watson as to Count I, Ex. D, ECF No. 22-1 at 174-75.) In 2000, Vance responded to requests from an IRS agent on behalf of the Company. When Vance left the Company at the end of 2001, the Company was still operating, had employees, and was making payments to creditors. Vance testified that he never heard Watson tell anyone not to pay the taxes. When the taxes were not remitted when due, it was because there was a shortage of funds available to pay them.

Tammy used QuickBooks software to do the Company's bookkeeping. She only provided information to Watson and Joey upon request, not on any regular schedule. She testified, "They didn't really, you know, keep hands-on with it, they just, if they needed something I had it available to them." (Mot. for Sum. J. Against Joe Watson as to Count I, Ex. C, ECF No. 22-1 at 146.) The Company also used payroll software. Tammy entered the hours worked by each employee, and the software automatically calculated the tax withholding amounts and generated the employee paychecks. Sometimes Tammy signed the paychecks and

- 6 -

Case 1:15-cv-00052-JPJ-PMS   Document 29   Filed 10/11/16   Page 6 of 15   Pageid#: 284

sometimes Watson stamped them with his signature stamp. The software generated a check to be mailed with the quarterly tax return. Watson signed at least one quarterly trust fund tax return, in September 1999. The person handling payroll at the time was responsible for mailing the tax returns along with the check for the withheld amounts.

Tammy kept track of accounts receivable, and a woman named Marie kept track of accounts payable. Both Tammy and Marie were capable of generating accounts payable and accounts receivable reports, and Watson might have asked either of them for a report. Tammy estimated that Watson requested reports from her approximately five times per year. The accounts payable report consisted mostly of payroll, which was a fairly consistent amount week-to-week. Tammy testified that Watson had a general idea at any given time approximately how much the payroll would be that week and approximately how much money was owed to creditors and was due from customers. Tammy and Watson often discussed cash flow concerns, though not on a daily basis.

To Tammy's knowledge, the Company always filed its tax returns on time, though it did not always remit the payments with the returns. When Tammy began working for the Company in 1999, Joey expressed some concern to her about the Company's payroll taxes. She knew the Company was behind on its taxes because she saw notices from the IRS. She did not know whether the Company had made

any changes to resolve the problems or whether it had made any efforts to repay past-due amounts.

From 1999 through 2001, the Company experienced financial problems and fell behind on paying creditors. Tammy and Joey had conversations about which creditors to pay. Joey would look at how much money was coming in and which creditors needed to be paid, and he would decide which payments to prioritize. Tammy did not take any steps to conceal the payroll tax obligations from Watson, and she had no reason to believe anyone at the Company had concealed the obligations or the fact that they were not being paid. She did not recall ever having any conversations with Watson about the taxes, and he never told her to pay the taxes or not to pay the taxes. She took steps to collect amounts owed to the Company and did not stop trying to collect receivables until the Company ceased operations.

Tammy opened the Company's mail, and when an IRS notice came in the mail for Watson, it was Tammy's general practice to lay the notice on Watson's desk. It was not Tammy's practice to talk to anyone about the notices, and she does not recall talking to anyone about them. The Company continued to pay its accounts payable until Tammy stopped working there. It paid insurance companies, material suppliers, and subcontractors.

Watson identified his original signature on an installment agreement with the IRS covering the fourth quarter of 1994, second quarter of 1996, and third quarter of 1996 federal tax periods. The agreement was dated April 4, 1997. He did not recall signing the agreement, but he recalled speaking with an IRS agent about the Company's failure to timely pay its taxes. He believed the Company had repaid the taxes it had owed from the quarters covered by the agreement, but he did not recall making any subsequent changes to how the Company handled its tax obligations. Watson admitted that after communicating with the IRS and entering into the agreement, he was aware that the Company had an obligation to pay withheld employee taxes to the government. According to Watson, the Company fell behind again on its tax obligations when several customers failed to pay significant amounts owed to the Company.

Watson did not recall how he learned that the Company had failed to pay its payroll taxes for the last three quarters of 2001, which are the quarters at issue in this case, but he knew in 1999 or 2000 that the Company was having trouble paying its debts. Watson recalled talking with an IRS agent in or around 2001 and attempting to work out an arrangement to pay the taxes that the Company owed.

The government submitted a declaration of Jeffrey T. Zoellner, a Revenue Officer with the IRS, in which Zoellner declared that as of October 5, 2015, Watson was indebted to the United States in the amount of $551,688.01. This

amount represents unpaid payroll or "trust fund" taxes from the second, third, and fourth quarters of 2001, plus interest. Watson does not dispute the amount owed. The IRS sent at least four notices to Watson regarding the amounts overdue for each quarter; in total, it sent at least thirteen notices and demands for payment.

## II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual

- 10 -

Case 1:15-cv-00052-JPJ-PMS  Document 29  Filed 10/11/16  Page 10 of 15  Pageid#: 288

basis. *Id.* at 327. It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

Employers are required to withhold income, social security, and Medicare taxes from employees' wages and pay them over to the IRS. These taxes are known as "trust fund taxes" because the employers temporarily hold the funds in trust for the United States. *Slodov v. United States*, 436 U.S. 238, 243 (1978).

A responsible person can be held personally liable for failure to collect or remit trust fund taxes:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). This penalty is known as the Trust Fund Recovery Penalty ("TFRP"). "[A]n employer-official or other employee responsible for collecting and paying taxes who willfully fails to do so is subject to . . . a civil penalty equivalent to 100% of the taxes not collected or paid . . . ." *Slodov*, 436 U.S. at 245.

A person can be liable for a TFRP if he (1) is a responsible person with a duty to collect and remit trust fund taxes and (2) willfully fails to do so. *Plett v.*

*United States*, 185 F.3d 216, 218 (4th Cir. 1999). "Once the Government assesses a taxpayer for this liability, the taxpayer has the burden of proof at trial on both elements of § 6672 liability." *Erwin v. United States*, 591 F.3d 313, 319 (4th Cir. 2010). In this case, Watson does not contest that he was a responsible person. His sole defense is that his failure to pay trust fund taxes was not willful. He cannot sustain his burden of proof solely by relying on his own uncorroborated, self-serving testimony. *DeLong v. United States*, No. Civ. A. 96-0968-R, 1997 WL 375743, at *1 (W.D. Va. Mar. 4, 1997); *see Liddy v. Comm'r*, 808 F.2d 312, 315-16 (4th Cir. 1986).

The willfulness element can be met by a showing of reckless disregard for whether taxes were paid. *Lyon v. United States*, 68 F. App'x 461, 470 (4th Cir. 2003) (unpublished). "Willfulness is present if the responsible person had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government." *Gephart v. United States*, 818 F.2d 469, 475 (6th Cir. 1987). Remittance of trust fund taxes is "'no[t] excuse[d]' merely because 'as a matter of sound business judgment, the money was paid to suppliers . . . in order to keep the corporation operating as a going concern — the government cannot be made an unwilling partner in a floundering business.'" *Erwin*, 591 F.3d at 319 (quoting *Collins v. United States*, 848 F.2d 740, 741–42

(6th Cir. 1988)). In *Greenberg v. United States*, a case with facts similar to this one, the Third Circuit stated that a responsible person's

> failure to pay the withholding taxes [the employer] owed IRS is willful if he paid other creditors, including employees, knowing that the withholding taxes were due. It is no defense that the corporation was in financial distress and that funds were spent to keep the corporation in business with an expectation that sufficient revenue would later become available to pay the United States.

46 F.3d 239, 244 (3d Cir. 1994). "One who was a responsible person when taxes were incurred [by the business], and who only later becomes aware that they were not paid, acts willfully by then paying other creditors in preference to the United States, even if the money specifically withheld has been dissipated." *United States v. Vespe,* 868 F.2d 1328, 1335 (3d Cir. 1989).

In *Lyon*, the Fourth Circuit "conclude[d] that the record allow[ed] no conclusion other than that the failure to pay the taxes was willful." 68 F. App'x at 470. The undisputed evidence in that case showed that (1) Lyon was aware of overdue taxes, (2) he met with an IRS agent who informed him of the unpaid taxes and consequences of failure to pay, (3) he promised to make payments but did not do so, and (4) "the corporation had access to funds to pay the taxes, but the funds were used to pay other creditors instead." *Id.* The Fourth Circuit reversed the district court's grant of summary judgment to Lyon and instructed the district court to enter summary judgment in favor of the United States.

- 13 -

The undisputed record evidence in this case similarly demonstrates that Watson willfully failed to pay trust fund taxes for the three quarters at issue. He was well aware that the Company had failed to timely remit trust fund taxes in the past, yet he took no steps to ensure that the taxes were paid going forward. He knew that the Company had a pattern of prioritizing payments to other creditors over payments to the IRS. While he never told Swindall or Tammy not to pay the IRS, he knew that the Company had insufficient cash to meet all of its obligations, and he made decisions about which creditors had to be paid to keep the business operating.

Tammy stated that she delivered IRS notices to Watson, and Swindall testified that she gave him cash flow reports. Watson does not dispute that he had access to detailed financial information; he simply says that he did not bother to review the information. The government offered evidence that it mailed Watson a notice regarding unpaid amounts from the second quarter of 2001 on November 19, 2001, yet the Company failed to remit those amounts and instead continued to pay its employees and other creditors for at least several months following receipt of the notice. Watson claims ignorance and contends that he assumed the taxes were being paid, but that contention is not supported by the record evidence. As a responsible person, Watson could not avoid liability by burying his head in the sand. Given that he was the sole owner and CEO of the Company and the ultimate

decision maker, under the circumstances, he had a duty to direct the payment of the trust fund taxes rather than allowing the Company's assets to be disbursed to other creditors. Watson has not met his burden of proving that his failure to ensure the remittance of trust fund taxes for the second, third, and fourth quarters was not willful. Therefore, summary judgment in favor of the United States is warranted as to Count I.

III.

For the foregoing reasons, the United States' Motion for Summary Judgment against Joe Watson as to Count I (ECF No. 22) is GRANTED. Joe Watson is hereby liable to the United States pursuant to Count I of the Complaint for unpaid trust fund recovery penalties pursuant to 26 U.S.C. § 6672 relating to the unpaid Form 941 employment tax liabilities of Tri-Cities Industrial Builders, Inc. for the last three quarters of 2001 in the amount of $551,688.01 as of October 5, 2015, plus statutory additions accruing according to law after that date.

It is so **ORDERED**.

ENTER: October 11, 2016

/s/ James P. Jones
United States District Judge